# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TAMMY NAPIER,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-30

Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Tammy Napier brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

her application for supplemental security income ("SSI"). This matter is before the Court on

plaintiff's statement of errors and amended statement of errors (Docs. 16, 25), the

Commissioner's response in opposition (Doc. 21), and plaintiff's reply and amended reply

memoranda (Docs. 22, 24).

## I. Procedural Background

Plaintiff filed an application for SSI in February 2012, alleging disability since December

31, 2007, due to cervical spine disorder, gastrointestinal disorder, affective disorder, an anxiety-

related disorder, and substance abuse in remission.[1] The application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was afforded a hearing before

administrative law judge ("ALJ") Christopher Dillon on December 13, 2013. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing. On January 16, 2014, ALJ

Dillon issued a decision denying plaintiff's application. Plaintiff's request for review by the

Appeals Council was denied.

---

[1] Plaintiff previously filed applications for benefits in June 2006, December 2007, October 2008, April 2009, and June 2010. All such applications were denied. (Tr. 2241).

Plaintiff then filed an action in the United States District Court. *See Napier v. Commissioner of Social Security*, 3:15-cv-154 (S.D. Ohio). This Court remanded plaintiff's claim pursuant to Sentence Four of 42 U.S.C. § 405(g) for a new hearing and decision. (Tr. 2350-58).

The Appeals Council subsequently vacated and remanded ALJ Dillon's decision. (Tr. 2362). Plaintiff and a vocational expert appeared and testified at the subsequent administrative hearing before ALJ Mark Hockensmith on June 21, 2017. (Doc. 14 at Tr. 3337-60). On September 19, 2017, ALJ Hockensmith issued a decision denying plaintiff's SSI application and determining that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 2241-66). Plaintiff's request for review by the Appeals Council was denied, making the decision of ALJ Hockensmith the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1). If the claimant is doing substantial gainful activity, the claimant is not disabled.

2). If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3). If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4). If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5). If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since February 8, 2012, the date of the relevant application for supplemental security income (20 CFR 416.971, *et seq.*).

2. The [plaintiff] has the following severe impairments: cervical spine degenerative disc disease, lumbago, gastrointestinal disorder, migraine headaches, depressive disorder, anxiety disorder with features of post-

3

traumatic stress disorder, [and] substance use disorder in (possible) remission (20 CFR 416.920(c)).

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The [plaintiff] has the residual functional capacity to perform light work as defined at 20 CFR 416.967(b) subject to the following additional limitations: (1) the opportunity to change position every 30-45 minutes for two or three minutes at a time while remaining at the work station; (2) no climbing of ladders, ropes, or scaffolds; (3) no more than frequent climbing of ramps or stairs; (4) no more than frequent stooping, kneeling, crouching, or crawling; (5) no more than occasional overhead reaching bilaterally; (6) no work at unprotected heights or with dangerous machinery; (7) ready access to restroom facilities during scheduled breaks; (8) no exposure to loud noise (defined as anything louder than a normal office setting); (9) limited to simple, routine tasks; (10) limited to a static work environment with few changes in routine; (11) no fast-paced work or strict production quotas; (12) no direct dealing with the public; (13) no more than occasional interaction with co-workers or supervisors.

5. The [plaintiff] has no past relevant work (20 CFR 416.965).

6. The [plaintiff] was born [in] . . . 1965. From the date of the application for supplemental security income until she attained age 50 [in] . . . 2015, the [plaintiff] was classified as a "younger individual" for Social Security purposes. Since attaining age 50 [in] . . . 2015, the [plaintiff] is classified as an individual who is "closely approaching advanced age" (50-54 years old) for Social Security purposes (20 CFR 416.963).

7. The [plaintiff] has an 8th or 9th -grade or "limited" education as defined for Social Security purpose (20 CFR 416.964).

8. The [plaintiff] does not have "transferable" work skills within the meaning of the Social Security Act (20 CFR 416.968).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[2]

---

[2] The VE testified that plaintiff would be able to perform the requirements of light, unskilled occupations such as garment sorter, with approximately 120,000 jobs in the national economy, tagger, with approximately 300,000 jobs in the national economy, and office clerk, with approximately 73,000 jobs in the national economy. (Tr. 2265, 3356).

10. The [plaintiff] was not "disabled," as defined in the Social Security Act, since February 8, 2012, the date the application for supplemental security income was filed (20 CFR 416.920(g)).

(Tr. 2244-65).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

#### 1. Physical Impairments

Plaintiff established care with primary care physician, Sheila Llanes-Diopita, M.D., on September 5, 2012. (Tr. 1796). She complained of chronic neck and low back pain for a 10-year period. (*Id.*). Plaintiff reported that she suffered from migraine headaches 1-3 times per week, which were relieved with medication. (*Id.*). On examination, plaintiff exhibited a full range of motion of the neck with full flexion and extension; tenderness to palpitation of paraspinal muscles of her lumbar spine with no spinal tenderness; negative straight leg raise test; no edema of the lower extremities; and a stable gait. (Tr. 1797). Dr. Llanes-Diopita noted that plaintiff simultaneously complained that her pain specialist was giving her too much medication, yet Percocet did not lessen her pain at all, which "sounds like a red flag." (Tr. 1798). Dr. Llanes-Diopita prescribed Fioricet for migraines, Amitriptyline for spine pain, and referred plaintiff to pain management. (*Id.*).

Plaintiff returned to Dr. Llanes-Diopita on September 26, 2012, to discuss a recent mammogram, a cyst on her kidney, and complaints of frequent urination. Plaintiff reported that she was drinking at least 2 liters of soda each day. (Tr. 1793). At this appointment, plaintiff again had neck pain and stiffness, but she had no swollen glands. Her musculoskeletal examination remained the same. (Tr. 1794). Dr. Llanes-Diopita noted that plaintiff's urine test was normal and that she should cut down on the amount of soda she drinks each day. (Tr. 1795).

On November 27, 2012, at the direction of Dr. Llanes-Diopita, plaintiff established care with Dr. Robert Windsor, M.D., at Dayton Pain Management. (Tr. 1892-97). At the first visit,

plaintiff complained of low back pain and neck pain as a result of degenerative disc disease developed several years prior. (Tr. 1892). She described her low back pain as 7/10 in severity with a stabbing and sharp quality that radiates across the back and bilateral hips. (*Id.*). Dr. Windsor noted that physical therapy had been ineffective in relieving plaintiff's pain, which was aggravated by standing and sitting for prolonged periods, walking, exercise, climbing stairs, and moving her neck. (*Id.*). On examination, plaintiff had moderate bilateral tenderness present in the lumbosacral region and mildly reduced lumbar spine flexion. (Tr. 1895). Dr. Windsor assessed spondylosis with myelopathy in the lumbar region. (Tr. 1898). A neural scan of plaintiff's lumbar spine and lower extremities showed "very severe" nerve pathology in plaintiff's right L5 peroneal nerve. (Tr. 1899). Dr. Windsor prescribed pain medications and ordered MRIs of plaintiff's lumbar and cervical spine. (Tr. 1896-97). At a follow-up appointment in December 2012, plaintiff reported that Vicodin was not working in relieving her pain. (Tr. 1883). Plaintiff's physical examination remained unchanged from the previous visit. (Tr. 1886). Plaintiff received an increased Vicodin dosage and Voltaren gel. (Tr. 1883).

In January 2013, plaintiff received two cervical epidural steroid injections and MRIs of the cervical and lumbar spine. (Tr. 1848-53). The cervical spine MRI revealed C6-7 left paracentral disc herniation with mild bilateral neural foraminal encroachment, left greater than right and C5-6 bulging disc and early osteophyte formation. (Tr. 1850). The lumbar spine MRI revealed localized disc herniation at L5-S1 with a mild degree of bilateral neural foraminal encroachment related to lateral bulging disc and L4-5 bulging disc. (Tr. 1851). Dr. Windsor's treatment notes through 2013 showed paraspinal muscle tenderness, reduced range of motion, facet tenderness, muscle spasm, trigger points in the cervical spine, paraspinal muscle

7

tenderness, and reduced range of motion in the lumbar spine. (Tr. 2136, 2146, 2157, 2166, 2178, 2190, 2201, 2212-13, 2223-24).

In March 2013, plaintiff visited Dr. Llanes-Diopita to discuss obtaining medication for anxiety, bipolar, and depression. Plaintiff reported that she treated with a psychiatrist in the past, but she stopped going to that clinic because she did not like how it was run. (Tr. 1843). She also reported that her depression and anxiety caused daily panic attacks and sleep disturbance. (*Id.*). Plaintiff stated that her pain specialist for chronic back pain referred her to a spine specialist and neurosurgeon, who determined that she needed surgery on her neck. (*Id.*). Dr. Llanes-Diopita found plaintiff's spine was tender on palpation with muscle spasms. (Tr. 1844). Dr. Llanes-Diopita assessed increased urinary frequency, lower back pain, bipolar disorder, depression, and anxiety disorder. (Tr. 1845). She concluded that plaintiff needed to establish care with a new psychiatrist and continue pain management. (*Id.*).

In May 2013, plaintiff underwent a series of cervical and thoracic spine x-rays. (Tr. 1961). The cervical imaging showed hypertrophy, facet arthropathy, and leftward C5-6 foraminal stenosis. (*Id.*). The thoracic imaging showed an incomplete congenital vertebral segmentation at T3-4 with associated scoliosis. (*Id.*).

On August 27, 2013, plaintiff's treatment records note that Dr. Llanes-Diopita refused to provide additional refills for plaintiff because the Ohio Automated Rx Reporting System (OARRS) report showed that two other primary care physicians also prescribed medication. (Tr. 1946).

In November 2013, plaintiff had an updated MRI of the cervical spine, which revealed mild degenerative spondylosis with disc disease and uncinate/facet arthritic changes at C5-6 and C6-7 and no significant changes from the January 2013 MRI. (Tr. 1979). After the MRI,

8

plaintiff returned to neurosurgeon Dr. Raymond Poelstra, M.D., who she had initially consulted

with in September 2013. Dr. Poelstra noted that plaintiff's November 2013 MRI showed

degenerative changes at the C5-6 and C6-7 levels, greater on the left than the right with

spondylitic changes. (Tr. 2236). Dr. Poelstra and plaintiff discussed the possibility of surgical

intervention. (*Id.*).

Plaintiff consulted with pain management specialist, Nirmala Abraham, M.D., on May 4,

2015, complaining of headaches. Dr. Abraham noted that plaintiff was "hypersensitive to touch"

on exam. (Tr. 2499). Plaintiff reported pain located in her neck that radiated to her head and left

arm. (Tr. 2450). Plaintiff described her pain as throbbing, shooting, cramping, gnawing, tender,

heavy, splitting, tiring, sickening, and fearful. (*Id.*). She rated her pain at worse as 8/10 on a

numeric pain scale. (*Id.*). On examination, plaintiff had a tender cervical spine with pain on

palpation of the cervical facets. (Tr. 2504). Her range of motion was reduced, with flexion,

extension, and rotation causing pain. (*Id.*). Plaintiff's strength and muscle tone were weak, and

she had palpable trigger points in the muscles of the head and neck. (*Id.*). Dr. Abraham noted

that plaintiff had already tried all appropriate interventional and medication management options

without significant relief. (Tr. 2499). However, Dr. Abraham found no specific signs "to

confirm a diagnosis of migraine headache." (*Id.*).

Plaintiff visited Dr. Kathleen Oxner, M.D., at Sycamore Primary Care Center on

December 17, 2015. Dr. Oxner explained that plaintiff was unwilling to cut back on NSAIDs

and suspected there was a component of rebound migraine. Dr. Oxner noted that plaintiff was on

multiple medications that should help with migraines, but she was not interested in trying Elavil,

physical therapy, or OMT (Osteopathic Manipulative Treatment). Dr. Oxner reported that she

would not prescribe Fioricet, opining that it was "likely to also make her rebound headaches worse and she is already on Clonopin and the Fioricet contains a barbiturate." (Tr. 2600).

In March 2016, plaintiff saw primary care physician, Charissa Geyer, M.D., at Sycamore Primary Care Center and complained that she was experiencing headaches 5 days per week. Plaintiff reported experiencing headaches since she was 12 years old with a family history of migraines. Plaintiff described them as constant on the left side of her face/head and stated that they do not ease up. She also reported photo/phonophobia, nausea, vomiting, and changes in vision but no loss of vision. She reported that she wakes up with a headache every morning. (Tr. 2610). Dr. Geyer explained to plaintiff that the medications she is taking would treat migraines prophylactically. Dr. Geyer explained that she would not add topiramate as plaintiff was already taking Depakote. Dr. Geyer believed that "[m]uch of her migraine headache [is] likely due to rebound [headaches] from analgesics. Patient was counseled on stopping all analgesics but she states that the [headache] is too bad to not take anything." (Tr. 2612).

In June 2016, plaintiff began treatment with primary care physician Dr. Mark Jeffries at Cornerstone Family Practice. (Tr. 3148-82). Plaintiff complained to Dr. Jeffries of chronic headaches associated with nausea, vomiting, and photophobia. (Tr. 3150-51, 3155). Plaintiff began treatment with pain management physician Dr. Martha Monica Corradine, M.D., in July 2016. (Tr. 3196-3201, 3206-08). Dr. Corradine documented plaintiff's complaints of neck, back, and lower extremity pain and clinical findings, including reduced spinal range of motion, palpable tenderness, and an antalgic gait. (*Id.*).

In March 2017, plaintiff consulted with the Clinical Neuroscience Institute for her chronic headaches. (Tr. 3312-18). Plaintiff reported that she had more than fifteen headache days per month and a chronic headache diagnosis was affirmed. (*Id.*).

## 2. **Mental Impairments**

On April 29, 2012, plaintiff was admitted to the Sycamore Hospital Emergency Room after a suicide attempt. (Tr. 1662). Plaintiff reported a history of depression with multiple suicide attempts, the most recent being in May 2006, and anxiety and hepatitis C. (*Id.*). The emergency room physician assessed: history of depression with multiple suicide attempts, history of bipolar, irritable bowel syndrome, chronic pain secondary to her irritable bowel as well as back pain, anxiety, Hepatitis C, and history of polysubstance abuse. (*Id.*).

In May 2012, plaintiff began mental health treatment with Clearing Paths Therapeutic Services ("Clearing Paths"). (Tr. 1693-99). At the initial assessment, plaintiff reported that she had been "really depressed" with symptoms including mood swings, crying spells, social anxiety, panic attacks, and flashbacks to past traumas. (Tr. 1693). On mental status examination, plaintiff had a depressed mood, logical thought process, full affect and cooperative behavior. (Tr. 1698). She also had avoidant eye contact. (*Id.*). Clearing Paths diagnosed plaintiff with major depressive disorder and anxiety disorder. (Tr. 1696). Treatment notes through the end of 2012 show that while plaintiff's mood symptoms were "better," her mood was "variable" and she still had symptoms of tiredness, mood swings, loss of interest in activities, and altered sleep. (Tr. 1773-1782).

Plaintiff underwent an initial psychiatric evaluation at Solutions Community Counseling and Recovery Center ("Solutions") on September 20, 2013, with complaints of depression and anxiety. Plaintiff described her symptoms as recurrent unexpected panic attacks, nightmares, flashbacks, crying spells, feeling frustrated, and episodes of agitation. She also reported a history of impulsivity and unstable mood. Plaintiff reported that she had been treated with several medications and had a good response to Depakote. She denied any suicidal or homicidal

11

ideations, violent ideations, or substance abuse. (Tr. 2115). The remainder of this evaluation was not completed. (Tr. 2116-19).

On October 28, 2013, a psychiatrist at Solutions noted that plaintiff was doing better, and she had no side effects from her medication. Plaintiff was also noted to be compliant with treatment and to be making progress. (Tr. 2121). On November 8, 2013, plaintiff reported that she had been accused of "doctor shopping," but she denied doing so. Her therapist noted that she was focused on medication and disability. She verbalized a moderate understanding that she must identify treatment goals if she wanted to remain in therapy. (Tr. 2131-32).

Plaintiff was evaluated for disability purposes on three occasions. Dr. James Rosenthal, Psy.D., examined plaintiff in July 2009. Dr. Rosenthal found that plaintiff was alert and fully oriented, able to follow and understand instructions, and showed no evidence of any thought disturbance. She had adequate knowledge, insight, and judgment to make appropriate decisions. Plaintiff reported that she helped with household chores, maintained her own personal grooming and hygiene, had a boyfriend she saw daily, and occasionally took care of her grandchildren, who were ages three and one at the time. Dr. Rosenthal diagnosed plaintiff with a depressive disorder and anxiety disorder, and assigned her a Global Assessment of Functioning (GAF) score of 55. Dr. Rosenthal found no impairment in her ability to follow 1-2 step job instructions; mild impairment in her ability to relate to other persons in a work environment; mild impairment in her ability to maintain attention and concentration; and moderate impairment in her ability to cope with work stress. (Tr. 1030-34).

Plaintiff was evaluated again for disability purposes by Dr. Jennifer Stoeckel, Ph.D, in January 2011. Dr. Stoeckel found plaintiff was alert, oriented, articulate and "fairly friendly," with logical, cohesive, and goal directed thought processes. Her affect was blunted and flat, and

she appeared mildly anxious, but there was no evidence of hallucinations, delusions, obsessions, compulsions, or phobias. Dr. Stoeckel diagnosed opiate dependence/abuse (reportedly in early remission), mood disorder, and alcohol abuse/dependence reportedly in remission, and assigned a GAF score of 59. Dr. Stoeckel found no impairment in plaintiff's ability to follow 1-2 step job instructions; mild impairment in her ability to maintain attention and concentration; and mild to moderate impairment in her ability to cope with work stress. Dr. Stoeckel also assessed moderate impairment in plaintiff's ability to relate to other persons in a work environment, although she could work in an occupation that did not require much public contact or direct supervision. (Tr. 1337-42).

A third consultative examination was conducted by Dr. David Chiappone, Ph.D., in May 2012. Plaintiff was cooperative; had logical, relevant, and coherent speech; and her thought associations were intact. Dr. Chiappone noted that plaintiff appeared somewhat anxious. Plaintiff reported that she tended to avoid other people, but she lived with her son, daughter-in-law, and grandchildren, and she sometimes got together with a friend to talk. Plaintiff was alert and fully oriented and her insight and judgment were rated as "fair." She stated that she watched TV and helped with household chores. Dr. Chiappone diagnosed polysubstance dependence in remission, anxiety, PTSD, and depression. According to Dr. Chiappone, plaintiff would have difficulty remembering information over time, although her memory was adequate for purposes of history-taking during the interview. Dr. Chiappone also concluded that plaintiff would have difficulty dealing with stress in a work environment, although she could relate appropriately to supervisors. (Tr. 1650-57).

State agency psychologists Dr. Karla Voyten, Ph.D., Dr. Carl Tishler, Ph.D., Dr. Katherine Fernandez, Psy.D, Dr. Karen Terry, Ph.D., and Dr. Cynthia Waggoner, Psy.D., each

reviewed plaintiff's psychological medical record. In December 2008, Dr. Voyten concluded that plaintiff was able to perform simple and even some moderately complex, routine tasks in a setting with brief interactions and without strict deadlines or quotas. (Tr. 816). In August 2009, Dr. Tishler noted that plaintiff gave conflicting information about her drug and alcohol use and concluded that plaintiff maintained the capacity to perform tasks in a relatively static work environment and she had no more than mild limitations in her capacity to interact with other persons, maintain concentration, and follow instructions. (Tr. 1064). In February 2011, Dr. Fernandez opined that plaintiff would be able to perform simple to moderately complex routine tasks in a relaxed environment that did not require constant interaction with the general public, strict time pressures, or production quotas. (Tr. 1346). In June 2012, Dr. Waggoner opined that plaintiff would be able to perform simple or even three-to-four step tasks. She would perform optimally in a non-public setting without close interaction with coworkers, supervisors, or the general public. (Tr. 87). In November 2012, Dr. Terry concluded that plaintiff would be able to perform simple or three-to-four step tasks. Dr. Terry opined that plaintiff would perform optimally in a non-public setting without close interaction with co-workers, supervisors, or the general public. Dr. Terry opined that plaintiff retained the ability to perform job duties in a static work environment where changes occur infrequently and can be easily explained to her. (Tr. 105).

### E. Specific Errors

In her statement of errors, plaintiff argues that the ALJ failed to reasonably weigh the opinions from her treating sources, Sheila Llanes-Diopita, M.D. and psychiatrist, Ramakrishna Gollamudi, M.D. Plaintiff also argues that the ALJ failed to reasonably account for her headaches in the residual functional capacity ("RFC") determination. (Docs. 16, 22).

**1. Whether the ALJ properly weighed the opinion of Dr. Sheila Llanes-Diopita.**

Plaintiff argues that the ALJ failed to properly weigh the October 2013 treating source opinion from Dr. Llanes-Diopita. (Doc. 25 at 13). Plaintiff argues that the ALJ fails to adequately support his conclusion that Dr. Llanes-Diopita's opinion has no foundation in the record. (*Id.*). Plaintiff argues that the ALJ discounted Dr. Llanes-Diopita's opinion in a "sweeping" fashion based on two negative clinical findings. (*Id.* at 14). Plaintiff also contends that the ALJ erred in rejecting Dr. Llanes-Diopita's opinion because she only saw plaintiff three times prior to completing the assessment. (*Id.*).

In response, the Commissioner contends that the ALJ properly afforded Dr. Llanes-Diopita's opinion "little weight" because she only examined plaintiff three times prior to completing the physical RFC assessment. (Doc. 21 at 12). The Commissioner argues that at the time Dr. Llanes-Diopita authored her opinion, "she was not considered a treating physician, and thus the more rigorous standards for evaluating such opinion evidence do not apply here." (*Id.*). The Commissioner also contends that the ALJ properly concluded that Dr. Llanes-Diopita's opinion was unsupported by the evidence of record, including Dr. Llanes-Diopita's own treatment notes that documented mostly unremarkable examination findings. (*Id.* at 12-13). The Commissioner also contends that Dr. Llanes-Diopita failed to explain how she came to the conclusions in her opinion and failed to support her opinion with evidence. (*Id.* at 13-14).

On October 2, 2013, Dr. Llanes-Diopita completed a questionnaire in which she reported that she had seen plaintiff three times in the past year. Dr. Llanes-Diopita identified plaintiff's diagnoses as cervicalgia, lumbago, anxiety, and bipolar disorder. Plaintiff's prognosis was stable. Dr. Llanes-Diopita identified plaintiff's symptoms as lower back and neck pain, and clinical findings included tenderness to palpation in the paraspinal muscles over the lumbar area,

full range of motion in the neck, negative straight leg raise testing, and a stable gait. (Tr. 1951).

Dr. Llanes-Diopita opined that plaintiff was functionally limited to walking 1 block, sitting for

about 2 hours in a work day for 1 hour at a time, and standing/walking for 2 hours in a work day,

for 30-45 minutes at any one time. (Tr. 1952-53). She noted that plaintiff must walk at least five

minutes at a time every 45-60 minutes. (Tr. 1953). Dr. Llanes-Diopita opined that plaintiff

could frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds

and could only occasionally use her neck to turn her head, look down, look up, and hold her head

in a static position. (Tr. 1953). Dr. Llanes-Diopita identified that plaintiff suffers from bipolar

disorder, which also affects her physical conditions. Dr. Llanes-Diopita stated that plaintiff is

not a malingerer. She also opined that emotional factors contribute to plaintiff's functional

limitations. Dr. Llanes-Diopita opined that plaintiff's pain and other symptoms would frequently

interfere with her ability to sustain the attention and concentration needed to perform even

simple work tasks. However, she opined that that plaintiff was capable of tolerating low stress

jobs. (Tr. 1952). She indicated that plaintiff would sometimes need 3 to 5 breaks per day,

lasting five to ten minutes. (Tr. 1953). Dr. Llanes-Diopita concluded that plaintiff would be

absent about 3 days per month and that plaintiff's limitations began on May 1, 2013. (Tr. 1954).

The ALJ concluded that Dr. Llanes-Diopita's opinion was not entitled to controlling or

deferential weight under the regulations. (Tr. 2259). The ALJ noted that her opinion was

"entirely unsupported by medically acceptable clinical and laboratory diagnostic techniques and

[was] inconsistent with other substantial evidence in the case record." (*Id.*). The ALJ explained:

> Clinical testing revealed no abnormalities of a significance that would account for
> the degree of limitation described by Dr[.] [Llanes-Diopita]. . . . Dr. Llanes-
> Diopiota [sic] saw the [plaintiff] a total of only three times in the year prior to
> completing her assessment (since September 2012) and, she indicated that the
> [plaintiff]'s condition was stable with negative straight-leg-raise testing and full

16

range of motion of the neck (Exhibit 69F). These clinical findings certainly do not substantiate the existence of any impairment that would be expected to functionally limit an individual to the extent described by Dr. Llanes-Diopita. The above-cited references from medical records fail to support the degree of limitation described by Dr. Llanes-Diopita. . . .

(Tr. 2260). The ALJ gave Dr. Llanes-Diopita's opinion "little weight." (*Id.*).

The Commissioner's regulations establish a hierarchy of acceptable medical source opinions. *Snell v. Comm'r of Soc. Sec.*, 3:12-cv-119, 2013 WL 372032, at *9 (S.D. Ohio Jan. 30, 2013); 20 C.F.R. § 416.927. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). The opinions of non-examining physicians are afforded the least deference under the regulations. *Woodcock v. Comm'r. of Soc. Sec.*, 201 F. Supp. 3d 912, 919 (S.D. Ohio 2016). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors

17

set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

Although the ALJ and plaintiff characterize Dr. Llanes-Diopita as a treating source, it is questionable whether this characterization is proper given that the record shows that Dr. Llanes-Diopita treated plaintiff only three times before rendering her assessment on plaintiff's physical health. *See Helm v. Comm'r of Social Sec.*, 405 F. App'x 997, 1001 n.3 (6th Cir. 2011) ("it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source-as opposed to a nontreating (but examining) source") (internal

citations omitted). However, because the ALJ characterized Dr. Llanes-Diopita as a treating

source, the Court will accept the characterization as valid. In any event, the record substantially

supports the ALJ's decision to give Dr. Llanes-Diopita's opinion less than controlling weight.

The ALJ gave "good reasons" for declining to afford controlling weight to Dr. Llanes-

Diopita's opinion. Dr. Llanes-Diopita's treatment notes lend little insight or support into her

opinion on plaintiff's physical limitations. As the ALJ reasonably noted, Dr. Llanes-Diopita

only treated plaintiff three times in the year prior to completing her physical RFC assessment. In

addition, the ALJ reasonably noted that Dr. Llanes-Diopita's opinion was not substantially

supported by her clinical findings and that her clinical findings "revealed no abnormalities of a

significance that would account for the degree of limitation" assessed by Dr. Llanes-Diopita. Dr.

Llanes-Diopita's clinical findings from these three visits show that plaintiff had a full range of

motion of the neck with pain on full flexion and extension and tenderness on palpation of the

spine with muscle spasms. (Tr. 1794, 1797, 1844). Although Dr. Llanes-Diopita cited these

clinical findings in her opinion, she also noted normal clinical findings of stable gait and

negative straight leg raising. (Tr. 1951). Dr. Llanes-Diopita did not explain how these findings

supported her conclusion, most notably that plaintiff was capable of standing and sitting for a

total of two hours each in an 8-hour workday and was likely to miss more than three days of

work per month due to pain from her physical impairments. (Tr. 1954). To the contrary, she

explained that plaintiff's prognosis was "stable" and that plaintiff was capable of performing low

stress jobs. (Tr. 1951-52). Thus, the ALJ was not bound to credit Dr. Llanes-Diopita's opinion

when it was unsupported by the record. Nevertheless, the ALJ's RFC determination ultimately

incorporated many of the limitations assessed by Dr. Llanes-Diopita, including limitations

involving exertion and stress. (Tr. 2257).

19

While the ALJ's decision does not reflect an extensive analysis of the regulatory factors set forth in 20 C.F.R. § 416.927(c)(2)-(6), the regulations require only that an ALJ decision include "'good reasons . . . for the weight give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citing *Wilson*, 378 F.3d at 547). Here, the ALJ's decision reflects a consideration of the regulatory factors. The ALJ considered Dr. Llanes-Diopita's length of treatment relationship and frequency of examination with plaintiff, which only consisted of three visits. (Tr. 2260). The ALJ discussed the consistency of Dr. Llanes-Diopita's opinion with her clinical findings and noted that her clinical findings documented no significant abnormalities that would support her assessed limitations. (*Id.*). The Sixth Circuit has held that an ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (quoting *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992)). Accordingly, the Court finds that the ALJ complied with the requisite two-step inquiry and gave "good reasons" for assigning Dr. Llanes-Diopita's opinion "little weight." Plaintiff's first assignment of error should be overruled.

**2. Whether the ALJ properly weighed the opinion of psychiatrist Dr. Gollamudi**

As her second assignment of error, plaintiff argues that the ALJ failed to properly weigh the opinion of her treating psychiatrist, Dr. Gollamudi. (Doc. 25 at 15). Plaintiff argues that the ALJ erred in discounting Dr. Gollamudi's opinion and citing her history of non-compliance with treatment, which the ALJ explained was a result of plaintiff's lack of transportation and "lackadaisical attitude." (*Id.* at 15-16). Plaintiff further argues that the ALJ erred in concluding that Dr. Gollamudi's opinion was not well-supported by the evidence in the record and failed to

cite specific evidence in support of this conclusion. (*Id.* at 16-17). Plaintiff contends that the ALJ erred in finding that Dr. Gollamudi's opinion was based on her subjective complaints. (*Id.* at 17). Plaintiff contends that "[t]his represents an unreasonable challenge to a medical opinion which addresses psychiatric impairments as the intangible nature of such impairments cannot stand to discredit the opinions of mental health practitioners." (*Id.*) (citing *Hawthorne v. Comm'r*, No. 3:13-cv-179, 2014 WL 1668477, at *10 (S.D. Ohio Apr. 25, 2014)). Plaintiff further contends that the ALJ erred in finding that Dr. Gollamudi's opinion on her absenteeism from work was speculative. (*Id.*).

In response, the Commissioner argues that the ALJ properly gave less weight to Dr. Gollamudi's opinion because it was not consistent with the record as a whole, particularly the eight other psychologists of record—examining psychologists Drs. Rosenthal, Stoeckel, and Chiappone and reviewing psychologists Drs. Voyten, Tishler, Fernandez, Terry, and Waggoner. (Doc. 21 at 14-15). The Commissioner contends that all eight psychologists found that plaintiff had only mild to moderate impairment in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id.* at 15). The Commissioner maintains that Dr. Gollamudi's "check boxes of marked restrictions in 12 areas [are] inconsistent with the bulk of the evidence," including the lack of clinical findings from Dr. Gollamudi. (*Id.* at 15-16). The Commissioner contends that the ALJ cited medical evidence that undercut Dr. Gollamudi's findings that plaintiff had marked limitations in several areas, including plaintiff's normal affect, judgment, thought content, and mood at multiple examinations. (*Id.* at 16). The Commissioner further contends that the ALJ properly took into consideration plaintiff's non-compliance with treatment. (*Id.* at 17-18).

21

In reply, plaintiff maintains that any alleged non-compliance with treatment was a direct result of her symptoms of mental illness. (Doc. 24 at 3) (citing Tr. 3333). Plaintiff argues that the Commissioner cannot post-hoc rationalize the ALJ's decision to discount Dr. Gollamudi's opinion by citing to purportedly normal mental status examinations in the record. (*Id.* at 4).

In April 2017, Ramakrishna Gollamudi, M.D., who treated plaintiff since March 2014, reported that plaintiff had been diagnosed with bipolar disorder with depression and PTSD. Dr. Gollamudi listed plaintiff's symptoms as: poor memory, sleep disturbance, mood disturbance, recent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, hostility and irritability, generalized persistent anxiety, intrusive recollections of a traumatic experience, decreased energy, flat affect, and social withdrawal or isolation. (Tr. 3333). Dr Gollamudi noted that plaintiff reported that she was making some progress with treatment. Dr Gollamudi also noted that mental health issues exacerbate her migraines. Dr. Gollamudi opined that plaintiff would likely be absent from work more than three times per month due to her impairments. (Tr. 3334). As to her functional limitations, Dr. Gollamudi found that plaintiff was moderately restricted in the following areas: activities of daily living; maintaining social functioning; ability to understand and remember detailed instructions; ability to carry out very short and simple instructions; ability to make simple work-related decisions; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to be aware of normal hazards and take appropriate precautions; and ability to travel in unfamiliar places or use public transportation. (Tr. 3335). Dr. Gollamudi also noted that plaintiff was markedly limited in the following areas: deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere); ability to carry out very detailed instructions; ability to maintain attention and concentration for extended periods; ability

22

to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with proximity to others without being distracted by them; ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others. (Tr. 3335).

The ALJ afforded "little weight" to Dr. Gollamudi's opinion that plaintiff suffered from marked limitations in several areas of functioning. (Tr. 2252). The ALJ noted that he gave Dr. Gollamudi's opinion "due consideration," but it was "clearly overstated when viewed within the context of the entire record." (*Id.*). In discounting Dr. Gollamudi's opinion, the ALJ cited plaintiff's history of non-compliance with treatment efforts. (*Id.*) (citing Exhibits 66F and 81F). The ALJ also noted that Dr. Gollamudi's opinion on plaintiff's "marked" limitations was "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." (Tr. 2253). The ALJ explained that Dr. Gollamudi's opinion appeared to be based on the "uncritical acceptance of the [plaintiff]'s subjective complaints." (*Id.*). The ALJ also explained that plaintiff's "[m]ental health treatment records do not document a mental impairment of a severity that would be expected to result in more than 'moderate' limitation of mental functioning." (*Id.*). The ALJ discounted Dr. Gollamudi's assertion that plaintiff would miss work more than three times a month as "entirely speculative and lacking any support in the medical record." (*Id.*). The ALJ

also explained that Dr. Gollamudi's opinion contrasted with the opinions of the state agency

reviewing and consultative examining psychologists who opined that plaintiff experienced no

worse than "moderate" limitations in any aspect of her mental functioning ability. (*Id.*).

The record substantially supports the ALJ's decision to give Dr. Gollamudi's opinion

"little weight." The ALJ gave "good reasons" for declining to afford controlling weight to the

extreme functional restrictions assessed by Dr. Gollamudi. The ALJ cited the treating physician

rule in his opinion, recognizing that if a treating source opinion is well-supported and not

inconsistent with other substantial evidence in the case record, it must be given controlling

weight. (Tr. 2252) (citing 20 CFR § 416.927). The ALJ properly declined to give Dr.

Gollamudi's opinion controlling weight based on the lack of supporting evidence in the record,

including clinical findings, treatment notes, and the opinions of the state agency and reviewing

psychologists and consultative examiners.

As an initial matter, the record does not contain, and plaintiff does not cite, any treatment

notes or clinical findings from Dr. Gollamudi that support his opinion. In his opinion, Dr.

Gollamudi indicated that he began treating plaintiff in March 2014; however, the record contains

no mental health treatment notes beyond March 2014. (Tr. 2478-2492). Moreover, when asked

to "[d]escribe the clinical findings including results of mental status examinations which

demonstrate the severity of your patient's mental impairments and symptom," Dr. Gollamudi

declined to answer the question and failed to cite any such evidence in support of his

conclusions. (Tr. 3334). In light of this, the ALJ properly discounted Dr. Gollamudi's opinion

because it was inconsistent with the record as a whole and appeared to be based on plaintiff's

subjective complaints. *See Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 979-80 (6th Cir.

2011) (finding ALJ properly discounted treating physician's conclusory about plaintiff's ability

24

to work which was "based largely on plaintiff's subjective complaints and was not supported by other medical evidence in the record"). In contrast to Dr. Gollamudi's opinion indicating several marked limitations, plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 55 on several occasions, which indicates "moderate" symptoms, on several occasions. (Tr. 2248) (citing Exh. 15F at 12, 24; Exh. 35F at 4). In addition, the ALJ cited to numerous instances in the record contradicting Dr. Gollamudi's opinion that show plaintiff exhibited a normal affect, normal judgment, normal mood, normal thought content, and logical thought processes. (Tr. 2248) (citing Exhs. 56F at 7, 60F at 8, 85F at 99, 336, 415, 432, 446, 475, 58F at 7). The lack of corroborating mental status examination findings is a valid reason to discount the treating psychiatrist's opinion. *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics. . . .") (citing 20 C.F.R. § 416.927; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

In addition to the lack of supporting clinical findings in the record, the ALJ also reasonably determined that Dr. Gollamudi's opinion was inconsistent with the findings of the eight psychologists, both consultative and state agency reviewing doctors, who rendered opinions on plaintiff's mental functioning. Drs. Rosenthal and Stoeckel, who examined plaintiff in July 2009 and January 2011 respectively, found that plaintiff had mild to moderate impairments in most areas of mental functioning. (Tr. 1030-34, 1337-42). Dr. Chiappone, who evaluated plaintiff in May 2012, rated plaintiff's insight and judgment as "fair" and opined that plaintiff would have difficulty dealing with work stress, remembering information over time, and maintaining attention and concentration over time. (Tr. 1656-57). Drs. Voyten, Tishler, Waggoner, Terry, and Fernandez, who reviewed plaintiff's file between 2008 and 2012, all

concluded that plaintiff had no worse than moderate limitations in any aspect of her mental

functioning. (Tr. 87, 105, 816, 1064, 1346). Plaintiff argues in her reply brief that the ALJ must

cite conflicting substantial evidence to deny a treating source opinion controlling weight, rather

than solely discount the opinion based on the medical opinions of non-treating and non-

examining doctors. (Doc. 24 at 4) (citing *Gayheart*, 710 F.3d at 377). Here, however, the ALJ

did not reject Dr. Gollamudi's opinion solely on the basis that it was inconsistent with the state

agency psychologists. As explained above, the ALJ reasonably found that Dr. Gollamudi's

opinion was inconsistent with the record as a whole, including moderate GAF scores and normal

examination findings.

The ALJ also reasonably discounted Dr. Gollamudi's opinion based on plaintiff's non-

compliance with treatment and sporadic treatment history. The ALJ reasonably noted that

plaintiff had a history of sporadic mental health treatment for symptoms of depression, anxiety,

and PTSD. (Tr. 2248) (citing Exh. 13F, 15F, 20F, 27F, 29F, 35F, 41F, 54F, 58F, 66F, 75F, 81F,

and 89F). In addition, plaintiff discontinued mental health treatment at Clearing Paths on her

own initiative in February 2013 due to an alleged lack of transportation. (Tr. 2252-53) (citing

Exh. 66F). The most recent treatment note present in the record from Solutions in March 2014

states that plaintiff was not consistent in treatment, missed appointments, and did not respond to

phone calls. (Exh. 81F at 1, Tr. 2478; *see also* Tr. 2252 (citing Exh. 81F)). Plaintiff argues that

her failure to seek treatment is attributable to her lack of transportation, combined with the

"disruptive symptoms of her mental and physical impairments; symptoms which would further

compromise her ability to diligently and consistently pursue, attend to, and otherwise comply

with treatment on a reliable basis." (Doc. 25 at 15) (citing *White v. Comm'r of Soc. Sec.*, 572

F.3d 272, 283 (6th Cir. 2009)). However, the record is devoid of any evidence that plaintiff's

failure to seek psychological treatment or failure to find transportation for her appointments was a result of her mental condition. *See White*, 572 F.3d at 284. Plaintiff also argues that the ALJ erred in failing to apply Social Security Ruling ("SSR") 82-59 and make a finding that "the record conclusively establish that treatment compliance not only would have been beneficial to plaintiff, but would have restored her ability to work." (Doc. 25 at 16) (citing Social Security Ruling 82-59, 1982 WL 31384 (Jan. 1, 1982). However, SSR 82-59 is inapplicable to this case because a disability finding is a prerequisite to the application of this ruling. As explained by the Sixth Circuit, "failure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore [her] ability to work." *Hester v. Sec'y of Health & Human Servs.*, 886 F.2d 1315, 1989 WL 115632, at *3 (6th Cir. 1989). The ALJ did not find any of plaintiff's impairments to be disabling under steps one through five of the sequential analysis. Therefore, the ALJ was not required to conduct any analysis under SSR 82-59.

Finally, the ALJ reasonably found that Dr. Gollamudi's opinion that plaintiff would miss three days of work each month was neither supported by the record evidence nor explained by Dr. Gollamudi in his opinion. As stated above, Dr. Gollamudi failed to cite treatment notes or clinical findings in support of his opinion. Thus, the ALJ properly rejected this conclusion as "entirely speculative." Plaintiff has not cited to objective evidence in the record supporting Dr. Gollamudi's opinion. Rather, she solely disagrees with the way the ALJ weighed the evidence. *Whetsel v. Comm'r of Soc. Sec.*, No. 2:15-cv-3015, 2017 WL 443499, at *8 (S.D. Ohio Feb. 2, 2017) ("[I]t is not this Court's job to reweigh the evidence, but only to determine if the ALJ has evaluated it in a reasonable fashion.") (Report and Recommendation), *adopted*, No. 2:15-cv-3015, 2017 WL 1034583 (S.D. Ohio Mar. 16, 2017).

While the ALJ's decision does not reflect an extensive analysis of the regulatory factors set forth in 20 C.F.R. § 416.927(c)(2)-(6), as stated above in connection with Dr. Llanes-Diopita's opinion, the regulations require only that an ALJ decision include "'good reasons . . . for the weight give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis*, 414 F. App'x at 804 (citing *Wilson*, 378 F.3d at 547). The ALJ recognized that Dr. Gollamudi was a treating psychiatrist and considered the inconsistency of his opinion with the record as a whole. Overall, in discussing Dr. Gollamudi's opinion, the ALJ provided "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and [was] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Guinn v. Comm'r of Soc. Sec.*, 555 F. Supp. 2d 913, 920 (S.D. Ohio 2008) (quoting *Wilson*, 378 F.3d at 544). Accordingly, the Court finds that the ALJ complied with the requisite two-step inquiry and gave "good reasons" for assigning Dr. Gollamudi's opinion "little weight." Plaintiff's second assignment of error should be overruled.

### 3. Whether the ALJ properly accounted for plaintiff's headaches in the RFC determination.

Plaintiff alleges in her third assignment of error that the ALJ failed to reasonably account for her headaches in the RFC determination. (Doc. 25 at 18). Plaintiff argues that the ALJ improperly "supplant[ed] his own lay opinion for the repeated diagnosis of migraines by multiple treating physicians, including specialists." (*Id.*). Plaintiff also argues that the ALJ's consideration of her headaches contrasts with the findings made by this Court prior to the case's remand. (*Id.*) (citing Tr. 2422). Plaintiff states that her headaches have been described in the

record as occurring spontaneously and being accompanied by symptoms of photophobia, nausea, and vomiting. (*Id.* at 18 n.8) (citing Tr. 52-53).

In response, the Commissioner argues that the RFC fully accommodates plaintiff's headaches by finding that she should not be exposed to loud noise in the work environment. (Doc. 21 at 20). The Commissioner maintains that the RFC fully takes into consideration potential limitations that were raised by the Court in its remand order. (*Id.*).

In reply, plaintiff argues that the loud noise restriction has "little to nothing to do with the manifestations of Plaintiff's actual migraine headaches as they are documented throughout the record" and described as occurring spontaneously and occasioning symptoms such as photophobia, severe pain, nausea, and vomiting. (Doc. 24 at 6) (citing Tr. 54, 3151, 3155, 3312-18).

In addressing plaintiff's headaches and the Court's prior remand order in the RFC, the ALJ stated:

> The other aspect of the Court's remand order was that the prior decision failed to account for alleged migraine headache symptoms. As previously discussed at Finding No. 2, medical evidence does not conclusively establish that any headaches are true migraine headaches. In addition, the [plaintiff]'s testimony concerning her purported migraine headaches was both confusing and contradictory. (In fact, there is some evidence to suggest that such headaches are not actually migraine headaches but, rather, a consequence of overuse of prescribed medication –see Dr. Abraham's report at Exhibit 83F). The [plaintiff] testified that she has "migraine" headaches three or four times per week with such headaches often lasting two or three days at a time and causing her to remain in bed during such times. She also testified (in a somewhat contradictory manner) that she has both "good" days and "bad" days equally as often. On "good" days, she functions normally and sometimes takes her grandchildren to a park. Even Dr. Llanes-Diopita expressed some reservations about the plausibility of the [plaintiff]'s pain complaints (Exhibit 59F at 4). Between May and August 2013, Dr. Llanes-Diopita refused to refill the [plaintiff]'s prescribed medications because of the possibility of her misuse of such medication (Exhibit 68F at 3). The [plaintiff] also requested a note excusing her from court-ordered community service (which Dr. Llanes-Diopita declined to provide) (Exhibit 68F at 3).

(Tr. 2261-62). The ALJ further explained: "To avoid a potential trigger for headache pain, I find that the [plaintiff] should not be exposed to loud noise in the work environment (defined as anything other than a normal office setting)." (Tr. 2262). This noise restriction was consistent with plaintiff's testimony that her headaches were aggravated by noise. (Tr. 2247, 3347).

In light of the ALJ's responsibility of assessing an individual's RFC based on all of the relevant medical and other evidence and resolving conflicts in the evidence, *see* 20 C.F.R. § 416.946(c), 20 C.F.R. § 416.927(d)(2), 20 C.F.R. § 416.920b, the Court finds that the ALJ's RFC determination appropriately accounts for plaintiff's headaches. In determining that plaintiff's headaches constituted a "severe" impairment and in assessing plaintiff's RFC, the ALJ thoroughly considered the evidence of record documenting plaintiff's headaches. (Tr. 2246, Tr. 2261-62). The ALJ noted that pain management specialist Dr. Abraham could not confirm a diagnosis of migraine headaches and suggested that plaintiff's headaches were attributed to "rebound" consequences of long-term use of prescribed medication. (Tr. 2246) (citing Exh. 83F at 1, Tr. 2499). The ALJ also noted that while migraine headaches were frequently documented throughout the record, the diagnoses were based largely on plaintiff's self-reported symptoms and complaints of pain, which were substantiated by the fact that the record documented her migraine headaches as "unspecified," "without status migrainosus," or "not intractable." (Tr. 2246) (citing Exh. 84F). The ALJ also reasonably considered that plaintiff was "unwilling to reduce her intake of medications in an effort to resolve the headache complaints nor was she interested in modes of treatment not involving medication which lends a further air of incredulity to her complaints." (*Id.*). In addition, the ALJ noted that primary care physician Dr. Llanes-

Diopita expressed concerns about plaintiff's complaints of pain and requests for medication refills. (Tr. 2262) (citing Exhs. 59F at 4, 68F at 3).

Other than citing her own self-reported headache symptoms of photophobia, nausea, severe pain, and vomiting (*See* Doc. 24, citing Tr. 54, 3151, 3155, 3312-18), plaintiff has not cited to any medical evidence or a medical opinion substantiating her allegations that her headaches restrict her in a manner greater than assessed in the ALJ's RFC determination. As the ALJ thoroughly considered the evidence pertaining to plaintiff's headaches and resolved conflicts in the record regarding plaintiff's headaches, and substantial evidence supports the ALJ's finding that these impairments do not impose functional limitations in addition to those included RFC finding, plaintiff has not shown any error in this regard. Accordingly, plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date: 6/28/19

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TAMMY NAPIER,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-30
Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).